WM. H. CHRISTY ET AL., APPELLANTS, VS. JOSHUA L. BURCH, APPELLEE.

1. An answer to a bill in equity is evidence only so far as it is responsive to the bill. Sufficiency of evidence to overturn answer discussed.

2. When a deed to real estate has been lost, and its loss and the contents thereof have been established, this court will presume that it was executed in accordance with the formality required by law.

3. Our statute regulating the manner of conveying property of married women, sec. 6, p. 755, McC's Digest, which provides that the property of the wife " shall only be conveyed by the joint deed of the husband and wife duly attested, authenticated and admitted to record, according to the laws of Florida regulating conveyances of real property," did not intend to make invalid, *as between the parties thereto,* a deed otherwise in accordance with the statute, though not recorded.

Appeal from the Circuit Court for Duval county.

The facts of the case are stated in the opinion of the court.

*A. W. Cockrell & Son* for Appellants.

BRIEF FOR APPELLANTS.

STATEMENT.

Complainants and Appellee Burch claim title to certain tracts of land, aggregating about twenty-four acres, in the suburbs of Jacksonville, which title they set up was, while vested in Mrs. Mary M. Christy, then, ever since and now the wife of William H. Christy, conveyed by Mr. and Mrs. Christy to one Edward Houstoun by a certain deed which was lost before it was recorded.

Respondents and appellants Christy deny that they or either of them executed, or partially executed, or proposed

to execute, to said Edward Houstoun or to any one, a deed of conveyance to said lands; and admit, not that they ever executed in part or otherwise, but that they proposed to execute at the time alleged, 1863, a conveyance to Houstoun of a certain portion of said land; and claim that the title to all said land is now vested in Mrs. Mary M. Christy.

### ARGUMENT.

The argument is directed to the points, *first*, that even conceding the title to certain lands was transferred to Houstoun by respondents Christy, not all but only a certain portion of the lands claimed by complainants was transferred; and *second*, that no conveyance was in fact executed by respondents.

### I.

Concede to complainants Burch, for the purpose of argument now made, that there was a deed formally executed by respondents Mary M. Christy and William H. Christy, to Edward Houstoun, an issue is distinctly and unequivocally formed, as to whether that deed embraced all the land, or was intended to embrace all the land east of the brick yard branch, together with the school house lot, conveyed to Mrs. Christy by Joseph S. Baker.

The bill alleges that the lost deed did embrace all said land; and the respondents Christy by their answers, severally, unequivocally and as of their own knowledge, deny that said alleged lost deed did embrace all said land.

The burden then is on the complainants to establish the issue thus distinctly made.

The answers distinctly set up the portions omitted, and state why, and the circumstances under which these portions were omitted.

The rule of law, as to the weight and nature of responsive statements in an answer, by which the courts are gov-

erned, is thus stated: " Whatever in the answer is fairly
a reply to the general scope of the claim set up in the bill,
whether by way of denial, excuse or avoidance, is evidence
for the defendant." 40 Vermont, 420; 22 Id., 68; 40 Id.,
130.

Conceding now for this branch of the augument, the com
petency as a matter of law, hereinafter assailed, of the ev-
idence on behalf of complainant Burch, is it sufficient to
overcome the sworn responsive statements of the answers ?

The answers set up that the original contract of sale did
*not* embrace the school house lot; that Houstoun was un-
willing to accept the description as set forth in the Baker-
Christy deed (62) of the lands so originally contracted to
be sold; but required a survey definitely fixing the
boundaries by metes and bounds, and definitely ascertain-
ing the acreage; and that this survey, by mistake as to the
boundaries, developed a deficit of acreage agreed to be sold;
that relying upon the accuracy of this survey, the respond-
ents accepted the deficit as to acreage as a fact; and sub-
sequently made a new contract with Houstoun by which
they agreed to sell the lands, so surveyed by Judge Dan-
iel, as they were surveyed by him, limiting and defining
the land, and also the school house lot; this last being es-
timated as equivalent in value to the acreage made to ap-
pear as deficit in the original arrangement; and the pur-
chase money consideration under the new contract being in
amount the same consideration Houstoun was to pay under
the first and abandoned contract; and that Houstoun paid
the purchase money and a deed was intended to be exe-
cuted in accordance with the new contract.

The answer further shows that it appeared afterwards
the surveyor made a mistake, and there was no real deficit;
and that the Baker-Christy deed did in fact embrace the
entire acreage along and east of the branch, which the re-

spondents Christy originally agreed to sell to Houstoun ; and that respondents never sold or conveyed the omitted portions of the Baker lands described in the answers, omitted from the Daniels survey and representing the deficit supposed ; and that the title to the same legal and equitable is still in the respondents Christy.

The question then is, does the evidence for the complainants Burch overturn the positive denials of the answers, and establish that these omitted portions were embraced in the alleged lost deed?

The rule is : " After the loss of a deed has been established, the secondary evidence of the contents, or substance of the contents, of its operative parts must be clear and direct, and its execution must be distinctly proved." Metcalf vs. VanBeutheysen, 3 N. Y., 424 ; 1 Greenl'f Evid., sec. 558, note, p. 601 ; Mariner vs. Saunders, 5 Gilm., 113.

In this case the bill alleges that these gores or strips of land were included in the deed from Christy to Houstoun. The respondents Christy, answering separately, each distinctly avers of his or her own knowledge that these gores or strips in question were not embraced or intended to be embraced or sold in the alleged lost deed, and each sets up why these portions were omitted.

The complainants, Joshua L. Burch and one Patrick Houstoun, are the only witnesses who are supposed to speak to the contents of the deed.  Burch swears (99) that he compared the deed executed by respondents to Houstoun with a deed prepared by one Daniel, now deceased, to be executed by Houstoun and wife to Burch and brother, these two deeds lying side by side on a table ; and the description parts of the deeds as to lands conveyed were identical ; that these two deeds, the one executed and the other prepared for execution, were forwarded to Houstoun, at Tallahassee, and at a proper time thereafter he received

a deed from Houstoun, but not the deed prepared by Daniel for Houstoun's execution ; that the execution by Houstoun of a deed different from the one so prepared for his execution caused him, Burch, to examine cautiously the deed that was executed by Houstoun ; and that the description of the property was the same ; and that the substitution or change he afterwards learned was because Houstoun wished to change the form of warrantee.

Patrick Houstoun says (149) he drew the deed executed by his father and mother to Burch and brother ; that the description in the deed to Burch " was copied from a deed from the Christys to Edward Houstoun ;" but upon cross examination he says (151): " I do not remember where and when said deed was executed. I was not a subscribing witness to said deed. I cannot recall whether it was witnessed, and if so who the witnesses were ; nor do I remember whether it was acknowleged before a judicial officer or not. I do not remember whether the said deed was certified by the clerk or not. I was not acquainted with the grantors ; have seen William Christy ; have not seen either of said grantors write ; do not know whether Mrs. Christy can write."

We submit that under this evidence the testimony of Mr. Houstoun depends for its value wholly upon the fact that the deed copied from was the identical deed, and none other, which is alleged to be lost. And there is no evidence whatever of this indispensable fact, without which Patrick Houstoun's evidence is, as to the respondents, Christy, purely hearsay, and inadmissible.

It is true the declaration of a *grantor* are admissible in corroboration of other evidence to establish the contents of a lost deed ; such declarations are against interest ; and the declarations of Edward Houstoun to his son would be com-

petent in corroboration of other evidence to establish the contents of the deed executed by him to Burch, if *that* deed were lost ; but no unsworn statement by him can establish the contents or the execution of a deed claimed to have been executed by the respondents, Christy, to him. It is clear that the sworn statement of Edward Houstoun at the time would not have been competent to establish the exist-ence of that deed, if the respondents, Christy, had in fact signed it, and the fact of its due execution was in issue be-fore an investigating court ; the subscribing witnesses alone could establish the fact of its execution. But the only tes-timony connecting Edward Houstoun with the writing identified by his son, as " the Christys' deed," from which the Burch deed is supposed to have been copied, is found in the deposition of the son, and is as follows : (149) " My attention was called to the warranty part by my father in-asmuch as it was different from the usual manner of giv-ing such warranties, and my father wished the deed he was making to Burch and brother to contain the same kind of guarantee." This then is the son's testimony as to his fath-er's declaration, explaining the departure in the Burch deed from the usual warranty clause; and the reasons compelling his father to the form that was adopted. Now if these de-clarations are to be rescued from the condemnation of the law as hearsay and unsworn and therefore inadmissible, it is of the highest importance that the substance of what is said, if not the very language used by the declarant, be preserved and reproduced with scrupulous exactness.

Burch testifies as to the declaration of Edward Hous-toun, the father, explaining to him, Burch, as grantee in the deed, why the usual form was departed from, as fol-lows : (101) " Col. Houstoun said to me in effect, in Flem-ing & Daniel's law office, when we were urging him to

straighten up this matter, that he was buying so much property here for the railroad in his own name, he had used this form for warranty to save him and his heirs from trouble."

These explanations of Edward Houstoun, as made to his son, and as made to Burch, are wholly contradictory.

It is not our province to reconcile this contradiction ; it in our opinion emphasizes the wisdom of the law which excludes hearsay testimony as incompetent. It is incredible, it seems to us, that Col. Houstoun could dictate to his son to depart from the usual form of warranty in the deed to Burch ; and require the recasting of a deed already prepared, in order to relieve himself and his heirs from responsibility for title to lands, to which he had no warranty title ; and for the reason he had no such warranty title ; and subsequently explain to his grantee, that he, Houstoun, had refused to become responsible for title, on the ground that he was merely buying for the use of the railroad company.

Be this as it may, these varying declarations of Edward Houstoun at least offsets, as evidence, the one the other ; and the evidence adduced by the complainants to this point, that is, the declarations of Houstoun, stands in equipoise.

But we submit, the incompetency of Joshua L. Burch to testify to any transaction with, or statements by, Edward Houstoun, his assignor under whom he claims, the said Houstoun being dead, is declared in terms by the statute. McC's Dig., Sec. 24, p. 518.

*The claim* set up in the bill is that the deed to Burch, executed by the deceased Houstoun, is a warranty deed Certainly the heirs of Edward Houstoun, of whom Patrick Houstoun is one, are interested in the issue made in the cause, and being interested in the issue, he is incompetent

to testify to any transaction with, or statement by, the deceased Houstoun, through whom Burch claims.

Again, is J. L. Burch a competent witness for any purpose in this cause? We submit, he is not. It cannot be denied, that Mrs. Christy and her husband, having been made by the complainants, parties defendant in this cause, they as husband and wife are incompetent to testify "for or against each other." And as any and all testimony introduced in this cause must of necessity to be admissible, operate for or against either the wife or the husband, it follows their mouths are just as effectually closed by the finger of the law, as they could be by the hand of death. And as the aim and object of the statute is, according to all the authorities, mutuality; see authorities collected in 35 New Jersey Equity Reports, page 89. In the language of Mr. Greenleaf Evd., Vol. 1, Sec. 168, we submit, "if the lips of the witness are sealed, it can make no difference in principle whether it be by the finger of death or the finger of the law."

But even if Burch is not excluded as a witness against those whom he has sued in such a form of action as that their mouths are closed, he ought not be permitted to profit by the fact that the finger of the law has sealed their mouths. The court will assume that Mr. and Mrs. Christy both would testify as witnesses to that which they have sworn to as defendants. And in weighing the testimony in this case, and in determining whether Burch has sustained his side of the issue raised by the pleadings, by two witnesses, or one witness, and corroborating circumstances, amounting in weight to the testimony of an additional witness, it is submitted, Burch's testimony should not be considered. The rule requiring two witnesses to overcome the positive denials of a sworn answer, was established when parties were not competent witnesses. The

rule was based on the testimony of persons, not parties to the record, and not interested in the event. It is a perversion of the rule, considering its origin and purpose, to hold that its requirements are met by a complainant, who produces himself as one of the two witnesses, in a cause where for any reason he has, by the form of his action, closed the mouths of his adversaries as witnesses.

Again, the answers of the defendants Christy finds corroboration in a material point, in the testimony of Burch. According to Burch, the school house lot was not embraced in the first arrangement or contract between defendants Christy and Edward Houstoun. According to Burch this first transaction was consummated into a deed, which he saw, and which he positively affirms, did not include the school house lot. The mouths of the defendants being closed by the inexorable finger of the law, they are not permitted to swear as to this statement. But we have the concurrence of complainant Burch and respondents Christy, upon the fact that the school house lot was not embraced in the first transaction between Houstoun and respondents. Why it was not embraced in the first transaction, and why it was embraced in the last, the respondents explain satisfactorily and fully; and their answers contain the only possible testimony, now accessible, directed to this explanation. The allegations of the bill and this testimony of Burch afford strong corroboration that the answers of Mr. and Mrs. Christy explain why the school house lot was not embraced in the first transaction and was embraced in the last. In the complainants' bill there is incorporated by "exhibit E" (41) a letter from William H. Christy, the husband, bearing date, *Aug. 23d, 1873* ; the statements of that letter are thus unqualifiedly made the statements of the bill ; 23 Ala., 762. This letter declares : "*that she*," meaning Mrs. Christy, defendant, "*has ever been and is now*

*willing to give quit-claim title to the land she sold to E. Hous-
toun, as described in deed written by his agent aforesaid,"*
meaning Judge J. N. Daniel; *" that she was unwilling to sign
any other paper unless the school house lot* (1 2-3 acres) *which
she gave to make up the reported deficiency of the land be re-
turned to her ; which would be but just and right as recent de-
velopments have disproved the reported deficiency of the land
named above."* Here then we have documentary evidence
produced by the complainants, absolutely conclusive, that
in Aug. 1873, the respondents set up the claim they now
set up, and vigorously protested, at and before said date,
that the school house lot was sold to make up a reported
deficiency of the lands, which did not in fact exist, and
that the fact of the absence of any such deficiency, was
made evident and flagrant by these recent developments,
and that justice and right required the school house lot be
returned to Mrs. Christy. And the complainants are
bound by these allegations thus incorporated, as if they
were severally set up as allegations of the bill.

When it is remembered that Houstoun, to whom the
land was sold, and Judge J. M. Daniel, who made the sur-
vey, by means of which the alleged deficiency was made to
appear, were both then living, and could have confronted
the respondents, Christy, with a denial of the fact that the
school house lot was taken for the alleged deficiency ; and that
the deed the respondents were then asked to execute (the
original of which is exhibited with the bill), was not in fact
identical, as to the description of the land, with the deed
which had so "mysteriously disappeared ;" it is difficult,
in the absence of any explanation by the complainants evi-
dence, as to why the school house lot was not embraced in
the first transaction, and was embraced in the last transac-
tion between Christy and Houstoun, for any rational inter-
pretation to reject the clear, well defined, consistent account

of the whole transaction sworn to by both the defendants, Mr. and Mrs. Christy.

Again, F. F. L'Engle, then acting as agent or attorney for Houstoun and complainants, and who is now living, produces the letter addressed to him, August 23, 1873, by Mr. Christy; and the complainants dare not place him on the stand to show that Houstoun and complainants did not then acquiesce in the statements of facts exhibited in the letter and now incorporated as a part of the allegations of their bill; or that the answers of Mr. and Mrs. Christy are inconsistent with accounts of transactions then or theretofore given by them.

It cannot be assumed, against the facts as sworn to by Burch, that all the parties were not, at the time this letter was written, alive to the value of the deed, so " mysteriously " disappearing. The question is asked Burch (105), " How long after the transaction was it that you applied?" That is, for the deed alleged to have been executed by the Christys to Houstoun. Answer by Burch (106): " Witness was here handed a paper for the purpose of refreshing his recollection." "Cannot say positively. It was four or five years afterwards, perhaps longer." As the deed by Houstoun to Burch was executed December 16, 1868, the date of Burch's application to Houstoun in respect of the alleged missing deed, is thus fixed at a period just prior to, or contemporaneous with, or just subsequent to, the date of W. H. Christy's letter to L'Engle, 1873.

So it clearly appears by incontrovertible evidence that Burch and Houstoun were distinctly notified that respondents, Christy, in 1873 asserted a fact that the school house lot was not embraced in the first bargain between them and Houstoun; and was inserted in the last bargain to make up a supposed deficiency of acreage developed by Judge Daniel's erroneous survey; and that upon the discovery of the

error, the respondents, Christy, were willing to execute a deed by way of quit-claim for the reduced acreage as defined in the survey made by Daniel; and were also willing to make a deed for the whole acreage embraced in the first bargain, provided the school house lot so inserted in the last bargain, to supply the supposed deficiency of acreage, was returned to them.

Again, Burch swears (101): " Colonel Houstoun said to me in effect, in Fleming & Daniel's office, when we were urging him to straighten up this matter," etc. Now, we submit, the straightening up there referred to is not the correction of Houstoun's deed to Burch; that deed had been accepted by Burch and was recorded January 1, 1869, as appears by the endorsement (140) of the clerk upon it. The only thing necessary at the date of this conversation to be straightened up was the completion of the missing link in Burch's chain of title, that is, the production of the so-called Christy-Houstoun deed, so " mysteriously " disappearing. So, we are bound to assume, the straightening up then insisted upon by Burch in this interview with Houstoun, was the supplying of this link; and that this conversation occurred after Burch made the application he swears he made to Houstoun, and after he says he discovered the so-called Christy-Houstoun deed was lost. Respondents Christy were willing at the time, and had so declared, as shown in the letter (41) of W. H. Christy, that they were willing to execute to Houstoun a deed for the land they had bargained to him, and for which they had been paid, that is the land as surveyed by Judge Daniel, and as described in the deed he prepared, so there could have been no controversy, and no straightening up required between Houstoun and Burch, as to the " factum " of the deed, since Houstoun's grantors stood ready to execute a deed; the only real controversy between them was this

controversy now precipitated upon the respondents Christy by the bill of complaint; and that is, did the bargain as executed between the respondents Christy and Houstoun, embrace other lands than those included in the survey and description by metes and bounds, executed by Judge Daniel; and whether or not the respondents were entitled to a return of the school house lot, upon their execution of a deed conveying all the land along the said branch sold by Houstoun to Burch.

It will be observed, too, that Houstoun did not then assert the deed was lost, he was only much (106) surprised it had not been recorded, and promised Burch he would look it up. It is not claimed that Houstoun did so, or that Burch ever afterwards demanded of him to carry out his promise. It is incredible that Burch's failure to act can be accounted for upon any other hypothesis than that he was satisfied the respondent Christy were entitled to a return of the school house lot, as a price of surrendering their lands along the brick yard branch.

Conceding therefore a deed consummating the last bargain between Edward Houstoun and respondent Christy was executed, we say the decided preponderence of evidence supports the answer that the portions, strips or gores, for which the school lot was substituted were not paid for, nor included.

## II.

*As to the execution of alleged lost deed.*

The execution of the deed set up in the bill as having been executed by respondents Christy to Edward Houstoun is distinctly, positively and unequivocally, of their own several knowledge, denied by the respondents. The respondents each swears that, though some papers may have been handed Houstoun, they never executed nor in-

tended to execute the conveyance alleged in the bill to have been executed and lost before recording.

The burden then is on the complainants to prove the execution of the alleged lost deed.

We discuss the testimony *first* from the standpoint of admitting for the purpose of the argument that Mrs. Christy as well as her husband was, and is *sui juris*, and *secondly* from the standpoint of a married woman's conveyance.

FIRST. The prerequisites of the execution of a deed of conveyance by a party *suis juris* is " sealing and delivery in the presence of two witnesses." Secs. 1 and 3, Act Nov. 15, 1820 ; Id. McC's Dig., Secs. 1 and 3, pages 214, 215.

Patrick Houstoun, one of the two witnesses who alone were questioned by complainants as to the execution, testifies as to a deed, which he fails to identify as the deed set up in the bill, but confesses that he does not know any fact tending to show its execution or its appearance as having been executed.

So complainant, Joshua L. Burch, who most of all is interested in the event, is the only one found to testify to the execution.

Before discussing other grounds showing Burch's testimony to be incompetent and insufficient, we submit that what is said by Burch as to this point is either elicited by plainly illegal leading interrogatories, or statements of legal conclusions, to all of which testimony objection was duly taken and insisted on. As illustrating his legal conclusions, Burch uses the phrases (98) " one deed properly executed." And (99) " deed duly executed " without by the way making it evident whether he refers to the deed set up in the bill, or the deed (98) which he swears did not include the school house lot. Subsequently (109) the respondents by their solicitor, subject to the objections made,

gives Burch an opportunity to explain what constitutes an execution, but Burch shows that he does not know, and with the aid of his solicitor explains that he is not an expert in the law.

There is no testimony as to whether the deed was sealed or delivered in the presence of two witnesses; and the only testimony as to whether the deed was sealed or delivered under any circumstances, is given in assent to leading questions (112, 113) to the effect that delivery *not* in the presence of two witnesses, but delivery merely is necessary for proper execution; and to the effect that a deed had a seal, not that the deed had two or more seals, not that either or both Mr. and Mrs. Christy had sealed the deed in the presence of two or more witnesses or otherwise, not even that a scroll, or the word seal, or the letters L. S., or anything, was so annexed to the deed as purported to be the seal of Mr. and Mrs. Christy or either of them, but simply that the deed had a seal.

And the only other testimony upon the matter of execution given by Burch is as to the witnessing, and is elicited by not even so mild a leader as "was the deed witnessed." Since, without previous testimony as to whether there were any witnesses, the solicitor (105) insists upon Burch's recolection *as to who the witnesses were*; Burch thus importuned replies, "I believe James M. Daniel was one witness. I do not remember the other. I know there were two witnesses at least to the deed."

What is meant here by "witnesses?" The word is very commonly used in reference to the signature on an instrument near to the signature of the party or parties to the instrument; and we submit that this is the utmost scope to be given to the term as used by Burch. Had he seen the persons at the time they witnessed the deed, and knew that they were witnessing the deed, he would no doubt

have been more definite and his testimony would have been different; but this is in no way pretended. And evidently the word is used in its derived and common meaning.

But further, Burch does not intimate that he at any time recognized or was able to identify any of the "witnesses" signatures. And though he *believed* he could recollect James M. Daniel was one, he subsequently confesses (103) that he is unable to identify the hand writing embodying "exhibit L.," and to prove the same and the name of James M. Daniel thereto annexed to be in James M. Daniel's handwriting, T. E. Buckman, Esq., (114,) and Col. J. J. Daniel (115) are subsequently examined.

So we submit all that Burch testifies to is that there *were on the deed at least two names, of which " James M. Daniel " might have been one, purporting to be the signatures of attesting witnesses.*

Were the original deed, produced from the proper custody presenting in every respect the proper appearance, with its execution duly acknowledged, offered in evidence, this testimony would not suffice to prove the execution, under the adjudication made in Hogan vs. Carruth, 18 Fla., 587-593. Affirmed in Skinner vs. Pinner, 19 Fla., 42.

Even if, in disregard of the fact, we admit that the signature of James M. Daniel were proved as subscribed to the deed, yet no other name is mentioned much less proven; and this is a fatal defect. For in Grover vs. Coffee, 19 Fla., 61, it is adjudicated that the whereabouts of the subscribing witnesses must be ascertained or inquired into before the testimony as to the handwriting can be introduced; and notwithstanding one witness is proved to be dead and proof of his handwriting is made without objection, yet evidence to the handwriting of the other is objected to and its admission assigned as error; and the court in passing on this point,

while admitting the necessity for further evidence, holds that as it is proven this second witness was out of the jurisdiction of the court, proof of his handwriting was duly made. According to Mr. Greenleaf (Evid. 1st vol. sec. 574): " If there is more than one attesting witness the absence of them all must be satisfactorily accounted for in order to let in secondary evidence. "

For aught the testimony tends to show to the contrary one or more of " the two witnesses at least, " may be living to-day and within the jurisdiction of the court; and therefore the evidence is plainly inadmissible. But admitting that " the two witnesses at least," are all dead, still we submit such testimony is wholly insufficient.

The court below seeing the necessity of having at least two " witnesses, " and perceiving from the testimony that one " John S. Swain " is now dead [105], used the name " J. S. Swain, " [161], upon the idea possibly that the deceased abbreviated his name thus since he died, for there is no testimony that he ever did it before, and with the comforting reflection no doubt that the said deceased can not make an objection likely to meet the approval of any terrestial court. With as much propriety, with equally as much support from the testimony, the court below could have forced the writer of this brief or even any or all of the members of this court to do service as veritable *bon fide* subscribing witnesses to this document, appearing at large as a deed upon the chancery court order book of Duval county.

With confidence we insist that were the deed itself produced, the testimony is wholly insufficient to prove its execution. But the complainants claim the deed they set up in their bill is lost. And the question arises does the loss of a deed dispense with proof? We submit were the loss of a deed to dispense with a particle of proof, it would be to the interest of grantees in many instances to loose or suppress

their deeds. The law, however, offers no such premium to negligence or fraud—see Shouler vs. Sheppard, 33 Ala., 646, and cases cited.

And our court recently enforces the necessity of strict proof when parol testimony is resorted to, in the language of the Chief Justice, (Stewart vs. Stewart, 19 Fla., 846), as follows: (Head Note 3.)—"Parol proof of a deed of conveyance, when admissible, must clearly show the due execution of a deed and so much of its contents as will enable the court to determine the character of the instrument, the identity of the property, and the quantity and quality of the estate conveyed."

(Opinion 1851.)—"The substance of the agreement ought to be proved satisfactorily; and if that cannot be done the party is in the condition of every other suitor in court who makes a claim he cannot support." Taylor vs. Riggs, 1 Pet. 60.

"In the case of Metcalf vs. Benthuysen, 3 N. Y. Rep. 424, the court in deciding a similar question, places its decision upon the ground that a title to lands duly authenticated by written evidence ought not to be set aside on the assumption of a previous lost conveyance, except upon clear proof by the claimant of the execution and existence of the supposed deed and of so much of its contents as will enable the court to determine the character of the instrument."

We submit then under the doctrine thus clearly announced and decided, the alleged lost deed is not proven.

And again we beg to offer further argument against the sufficiency of the testimony. The testimony is to the effect that the date of the alleged execution is some day during 1868. And so the *statute passed February* 24, 1873, Ch. 1939, is too recent to prescribe the requsites for this execution. But did it tend to affect the proof? We insist that as the title to this act relates wholly to acknowledgements,

all else contained in it is unconstitutional, (Const. 68, Art. IV, Sec. 14), null and void; and that the law enacted Nov. 15, 1828 is the law and the only law governing the execution of conveyances by persons *sui juris*. In sections 1 and 3 of this act of 1828, (1. D. Sec. 1 and 3, P. 214-215, McC's Dig.) The constituent elements of a conveyance are mentioned three different times, to-wit: "*sealed and delivered in the presence of two witnesses.*" That the term "witnesses" was not intended to mean "subscribing witnesses," is made conclusive by the use of the latter phrase later, in Sec. 4 of said Act, (*Id.* Sec. 6, p. 215, McC's Dig.) which relates wholly to recordation.

At the time of the passage of this Act the English law, which is followed in the most of the States of the Union, prescribed *subscribing witnesses*. Some meaning then must be attached to this only partial adoption of the foreign laws then existing.

And we insist it is plain that it was intended thereby that our laws require proof of the "*factum*" of sealing and delivery actually in the presence of witnesses, rather than proof of the genuiness of certain signatures appearing upon the face of the deed. And we submit that the presumption of fact as to execution arising from the presence of witnesses signatures when the law requires such subscription, does not necessarily arise from the presence of witnesses signatures when the law prescribes not that such signatures shall be on the deed, but that the witnesses shall witness the sealing and delivery.

The rules of evidence commonly quoted, as to the proof of the execution of a deed, are clearly based upon the English statute; for surely the proof of a fact which the law in no way mentions, cannot dispense with and actually supplant all proof of each and every element definitely and seperately

prescribed as *sine qua non* to the execution of a muniment of title.

Did the complainants prove the due execution of the alleged lost deed ? No—not even if they were merely put upon the proof. Whereas the burden upon them was to overcome *the clearly responsive denials of the answers.*

Second.—As to the execution of the alleged lost deed considered from the point of view that it is admitted to be a married woman's conveyance:

We repeat by reference thereto all above stated in regard to the constituent element of a conveyance of land by a party *sui juris*, and submit the reasoning as to the necessity of the concurrence of each and every element for the existence of the conveyance, and as to the strict proof of the same, is so much the stronger when applied to claims against a married woman's title to land.

But in addition to the elements discussed, there are in the case of a married woman two indispensable prerequisites, to-wit: *Acknowledgement* and *recordation.*

The bill sets up that the alleged lost deed was not recorded [8-9.]

And the only testimony as to an acknowledgement is made by complainant Burch, in answer to his own solicitor's leading questions [105] as to whether the deed had been acknowledged, and if so, before whom. Burch answers [105] "The deed was acknowledged to the best of my belief before John S. Swaim, a Justice of the Peace of this county." It will be observed this witness does not swear that the *Justice* made any certificate or did anything else.

Burch's solictor later [109] attempts to take advantage of the fact that Burch is not an expert in the law, and Burch himself claims [110] that he is not familiar enough with legal terms to use them correctly. So that admitting for the sake of the argument that Burch is competent to testify

when he has shut the mouths of Mr. and Mrs. Christy, admitting the deed he refers to in this instance is the alleged lost deed set up in the bill and not the deed testified to [98] by him as *not* including the school house lot; and admitting further that parol testimony may be introduced to prove the fact of acknowledgement, we insist that upon their own showing no evidence has been introduced as to the acknowledgement. But let us further admit, against the fact, that Burch is a lawyer and particularly learned in the law of conveyancing, still we insist that to prove even no more than that there was a certificate of acknowledgement endorsed on the deed, it would be necessary to testify to the aver-ment of the different parts of such certificate and to the genuiness of the officer's signature and other elements constituting the execution of such certificate; that is to say, *testimony to a legal conclusion is inadmissible.*

It is clear that if Burch had any meaning in his mind when he used the word acknowledgement, he ment no more than a certificate of acknowledgement. Then the question arises was it in the common form, namely, that the grantors acknowledged the execution of the deed; or was the certificate, or one of the certificates, in substance that Mary M. Christy acknowledged on a separate and private examination before John S. Swaim, a Justice of the Peace, separate and apart from her husband, that she executed the conveyance freely and without any fear or compulsion of her said husband? (Sec. 1, Act of Feb. 4, 1825; 1 D. McC's Dig., Sec. 6. page 755).

We submit there is no testimony, and even no testimony upon which a proper inference can be found, to the effect that such certificate, if any, as to Mrs. Christy, set forth in substance that the acknowledgement was taken as required by law.

The *privy examination* is the distinguishing element of

the requirements as to a wife's acknowledgement in all leg islation based upon a continuance of the disability of coverture; and even anterior to all legislation, the English courts required it in addition to a collusive suit. Bl. Com. 351. The phrase "privy examination and acknowledgement" is so commonly used that Burch's testimony to the acknowledgement merely, amounts almost to positive evidence that there was no "privy examination." We insist it was absolutely necessary for complainants to prove beyond doubting that there was a privy examination. And we could with confidence rest our case on that point alone. Hartley vs. Ferrell, 9 Fla., 379.

Further, complainant Burch testifies only as to his *belief* about Swaim; whether his hesitation was based on an uncertainty as to the date of Swaim's death, or as to the date of Swaim's appointment, or as to whether or not Swaim was a Justice of the Peace or a Notary Public, or was never either, cannot be determined. But it is plain enough, we insist, that such testimony is not positive enough to prove a fact susceptible in its nature of direct proof. And, indeed, the only fact it tends to prove is that Swaim's name appeared on the certificate. There is no testimony whatever to the effect that Burch knew that Swaim could write, much less that he knew Swaim's handwriting, and that he identified Swaim's signature.

Again, a vital question is, how is the compliance with the requisitions of the act to be evidenced and proven? Would parol testimony, reproducing the recitals of a properly worded certificate be admissible? We submit that such proof is not within the perview of our married woman's law.

" *The privy examination and acknowledgement of a feme covert cannot be proved by parol,*" is the apt expression of the

law in the syllabus of Elliott vs. Peirsol, 7 Curtis, U. S. Dec. 601; *Id.* 1 Peters, 328.

*Recording* is *necessary.* The act above referred to makes an express proviso not only that the husband shall join, but also that the deed shall " be made and authenticated in the manner prescribed by the several laws in force regulating conveyances of real estate, and the *recording* and authenticating the same." Even if this proviso stood alone, the legislative mind was sufficiently expressed that a record was required to complete an alienation of a married woman's lands. But to remove all doubt, if any, of the intent and meaning of this proviso of the act of 1835, as to the necessity of recordation, the Legislature, ten years after this first enabling statute, passed another act of March 6, 1845, sec. 6, (*Id.* sec. 6, McCl. Dig., p. 755,) as follows: " The real estate of the wife shall only be conveyed by the joint deed of the husband and wife, duly attested, authenticated and *admitted to record,* according to the laws of Florida regulating conveyances of real estate."

Without admitting the court has the right to modify a law so clearly put, because it may forsooth seem unreasonable, we beg to discuss the principle involved.

As noted in section 2 of this act of 1835, this enabling statute was passed in substitution for the common law mode of conveyance by fine, which is in terms abolished.

At common law a married woman's land could be alienated only either by " *levying a fine,*" or " *suffering a recovery,*" as the collusive suits to that end were technically called, and though differing slightly in the form were often confounded. "A *fine* was an *amicable composition* of a *collusive suit* intended to operate as a conveyance of lands by means of a solemn recognition by *matter of record* contained in such suit of the title of the proposed vendee, which he asserts by the suit to be preexisting in him, and which

the grantor, the defendant in the suit, *admits in solemn form upon the record* to be so.

The proceeding is of unknown antiquity, going back to the first rudiments of the common law, and as it appears even antedating the conquests." 2 Min. Inst., 900, 901; see also 2 Bl. Com., 348-9; 2 Th. Co. Lit., 604, and Seq., & N. S. 1, 2 and 3.

"A *common recovery* is a *collusive suit* instituted by the intended grantee against the intended grantor, in which the land in question is supposed to be recovered by the grantee." 2 Min. Inst., 903; 2 Bl. Com. 357 and seq.

These are classified by Blackstone as methods of alienation *by matter of record,* as distinguished from alienation by *deed, or matter in pais.* 2 Bl. Com. 293-4; *Id.,* 344.

Why was it necessary to resort to these modes to alienate a married woman's land?

First, Because a married women is *one with her husband,* her existence being merged with his; and secondly, because of the supposed *constraining influence exercised by the husband.*

By means of the fine or recovery the element of supposed constraint was counteracted by the presence of the court, and indeed a privy examination of the wife, (2 Bl. Com., 351); and the legal " oneness " was obviated by the suit of file and *record.*

In 1834, and at subsequent periods, the Parliament of England continued this policy of disability, founded upon the husband's constraint and wife's oneness with him, by replacing these expensive and rather cumbersome devices of fine and recovery with a *deed,* as to which the wife is privately examined by certain officials, duly *enrolled in the court of chancery.* Stat. 3 and 4 Wm. IV, C. 74. And so our statute, passed the next year, 1835, and also the act of 1845, as well as the enabling statutes to this end of various

States of the Union, prescribed *recordation*, as well as privy examination and acknowledgement.

We insist, therefore, that a married woman's conveyance is *still by matter of record*, and not by matter in pais, as in the days of Blackstone ; that our statute does no more than the enabling statute of England, to-wit: Substitutes the simple *recordation* for the collusive suit.  To use the words of the Chief Justice in Hartly vs. Ferrell, 9 Fla., 379, "To come to a different conclusion as to the intention of the Legislature would be to impute to that body a gross act of stultification."

This decision is upon the point that the act of 1845 does not conflict with the act of 1835 as to the requisition of "the private examination and acknowledgement of the wife," and we quote further:  " But this interpretation of this act is not dependent upon its *spirit*.  We think that the very *words* of the act are sufficiently comprehensive to indicate with certainty the intention of the Legislature.

The words of this section are : "And the real estate of the wife shall only be conveyed by the joint deed of the husband and wife, *duly attested, authenticated and admitted to record, according to the laws of Florida regulating conveyances of real property*."  [The italics are as used by the court.]

And we submit that the wording as well as the spirit of the law is at least as clear to the requirement of recordation as the requirement of privy examination and acknowledgement.

The conclusion, then, is irresistible, the admission by complainants that the title was in Mrs. Christy ; that she was then and continues under the disability of coverture, and that the alleged deed of conveyance has never been recorded, is in effect a declaration that the title remains in Mrs. Christy.

But suppose it should be admitted that history is an

"ignis fatuus" and our legislators not solons, still we insist that the corrective does not lie with the courts who are in terms prohibited by our constitution from exercising functions appertaining to the legislative department.

Courts in their very nature can possess no dispensing power. 38 Ala., 340, and cases cited. And though a court of equity may relieve a defect in the execution of a contract power and against one *sui juris* who has no equally meritorious equity, yet, "the defective execution of statutory powers in the failure to comply with the prescribed requisites, cannot be aided by equity." 2 Pom. Eq. 1, Sec. 834, page 294, and cases cited in note 1.

And we submit that if this court can dispense with the recordation, it can dispense with the witnessing or the privy examination and acknowledgement, and even with every one of these requisites.

As a matter of fact, not, however, as a matter of reproach, we readily grant, as stated in the opinion of the court below, this requisite of recordation is now for the first time raised in the judicial history of this State, and we deem it commendable on the part of our people, not that they have known the law *cela va sans dire*, but that they have approved and obeyed it so thoroughly. Similar laws in other States have not been so invariably obeyed, but the courts have, without hesitation, and without exception, enforced the same.

We beg careful consideration of the opinions by the United States Supreme Court on this point in 1 Peters 328, 329; 10 Peters, 524; 12 Peters, 375.

And see the case of Scarborough vs. Watkins, 50 Am. Dec., 529 (last headnote), and 537, where the distinction between recordation as to a married woman and a person *sui juris* is discussed.

On the question of substantial compliance with the statu-

tory requirements, the importance of the private examina-
tion, the incompetency of parol proof, and the want of
equity to aid the defective execution of statutory powers.
We submit the ably edited opinions and concise annotations
in 52 Amer. Dec., 519; 50 *Id.*, 444; 41 *Id.*, 179–184; 36
*Id.*, 90; 19 *Id.*, 230; 11 *Id.*, 724, and the citations to the
various State reports.

### SUPPLEMENTAL BRIEF FOR APPELLANTS.

In Tunno and Jessup & Co. vs. Robert, 16 Fla., 746-7, this
court commenting on Sec. 4, act of March 6, 1845 says :
" This section provides that the husband and wife shall join
in all sales and transfers and conveyances of the property
of the wife, and the real estate of the wife shall only be con-
veyed by the joint deed of the husband and wife duly at-
tested, authenticated and admitted to record, according to
the laws of Florida, regulating conveyances of real property.
The first clause requires the husband to join in the sale  or
transfer *of the property* of the wife, and second, makes an ex
press additional provision as to the disposition of her real
property, restricting the method to a deed duly attested, &c.

As then, under the ascertainment by this court of the
meaning of that act, which really  is too plain to require a
judicial construction, the second clause *makes an express ad-
ditional proviso restricting* the   method "whereby a wife
may dispose of her real property," to a deed *duly* attested,
authenticated *and* admitted to record, according to the laws
of Florida, regulating the conveyance of real property, it
clearly follows judicial usurpation of legislative functions is
required by the appellees at the hands of this court when
a demand is made upon it, to give the effect of a legal con-
veyance to a deed of the *not so  duly attested, authenticated
and  admitted to record.*

A deed not acknowledged and recorded as required by the

statute, is *not* operative even as between the parties. Sewall vs. Haymaker, 127, U. S. R., 719; and cases therein cited Rover's heirs vs. Roanoke; National Bank, 83 Virginia, 589.

*Fleming & Daniel* for Appellee.

McWHORTER, C. J.: Joshua L. Burch and Harriett H. Burch, in her own right and as the executrix of her husband, Smith Burch, filed a bill in the Circuit Court of Duval county against Mary M. Christy and William H. Christy, husband of the said Mary. The bill alleges that on the 16th day of December, A. D. 1868, one Edward Houstoun was seized in fee of the following lands in said State and county, to-wit: "All that certain piece or parcel of land situated and being one mile west of the City of Jacksonville, county of Duval and State of Florida, upon a branch known as the ' Brick Yard Branch,' and more particularly described as follows, to-wit: Beginning at a point in the centre of the channel of the said Brick Yard branch, on the north side of the culvert of the Florida Central railroad over said branch, and running thence down and along said branch in its channel in all its meanderings to McCoy's creek, thence eastwardly down said creek to the western boundary line of land formerly owned by J. C. Jaques, thence northwestardly along the line of said land to a point such that a line drawn thence due west will strike the stump of a persimmon tree which was a station tree on the line separating the land of William Sedgwick from the land herein described, and conveyed formerly of Joseph S. Baker, thence westwardly along said line to a point such that a line drawn thence due north would strike the southwest corner of a lot of land owned by one Burnham, thence northwardly on a line parallel with the boundary line of the aforesaid Sedgwick land to the southern boundary line of the

aforesaid Burnham's land, thence westwardly along the said southern boundary line to a lot known as the Brick Yard Church lot, thence along the boundary line of said church lot, southwardly, westwardly and northwardly to the starting point. And also that other piece or parcel of land situated and being in the same county and State, in La Villa, and known as the School House lot, being bounded on the north by lands belonging to the heirs of one Huffman, on the east by lands sold by the said Joseph S. Baker to F. F. L'Engle, on the south by a street separating it from lands sold to J. C. Jacques, and on the west by a thirty-foot street separating it from lands of William Sedgwick, containing one and a quarter acres, more or less."

That said Houstoun on said last mentioned day conveyed said lands by warranty deed to your orator, J. L. Burch, and his brother, Smith Burch, unincumbered ; that at the time of the execution of said deed by said Houstoun, he delivered possession of said land to your orator, J. L. Burch, and said Smith Burch, and that they jointly, in the life time of said Smith, held open and notorious possession of said land, and erected valuable brick buildings on the same, and since the death of said Smith Burch, your orators have held continued posssession of the same, and have continued to make improvements thereon. The bill further alleges that a short time before the sale by said Houstoun to J. L. Burch, the defendant Mary L. Christy, being seized in her own right of the above described lands, together with her husband, William II. Christy, conveyed by deed the said lands to said Houstoun, which deed was duly and properly acknowledged, but never recorded ; that this deed from said defendants to Houstoun is one of the links in the complainant's chain of title, and that the loss of the same, as is afterwards set forth in said bill, is a cloud upon complainant's title ; that said deed from Christy and wife to Houstoun was lost,

and that it was never recorded; that complainants had exhausted every means in their power to find said deed, but without success; that when it was found that said lost deed could not be discovered, said Houstoun employed one James M. Daniel as his agent, who requested said defendants to give to said Houstoun a quit claim deed of the said lands, and that they agreed to do so, and that said Daniel prepared and tendered to them for execution a quit claim deed for said lands, but the defendants failed to execute the same, and making various excuses for such failure; that said Houstoun died in the year 1875; that said William H. Christy, on the 22d of August, 1872, in a letter to F. F. L'Engle, admitted the making of the deed by himself and wife to said Houstoun, said letter is appended to the bill as an exhibit; that during all the time of the occupation of said land by orator J. L. Burch and his brother, Smith Burch, they have stood by and seen valuable improvements erected by them without claiming or attempting to claim the same; that said defendants, taking advantage of the accidental loss of said deed, have commenced a suit in ejectment against your orators for the possession of said land, except the School House lot. The bill prays for an injunction restraining the defendants from prosecuting further said ejectment suit, and that it may be decreed that all the interest of said defendants in said land passed by said deed to Houstoun, and that complainant's title is perfect as against said defendants and any person claiming under them.

Mary M. Christy and Wm. H. Christy separately answered the bill. The answer of Mrs. Christy alleges that she and her husband made an oral agreement with said Houstoun to sell him a certain *tract* of lands known as the Baker lands which she had purchased in her own right from one Baker, lying along and east of the brick yard branch south of the old alligator road about one and a half miles west of Jack-

sonville, but that said contract of purchase did not include the one and one-third acres on the west side of said branch, nor the school house lot mentioned in said deed to her from Baker; that afterwards said Houstoun was unwilling to accept in execution of said contract of sale a deed conveying to him in the terms and by the description employed in the said deed to her from said Baker, nor. was he willing to accept the acreage as estimated by the terms employed in said Baker deed, but he required a survey definitely fixing by links and chains the lands to be conveyed to him. A survey was thereupon made by said Houstoun, which survey defined by metes and bounds the exact limits thereof and determined the exact quantity of the land therein; that this survey did not take in all the lands embraced in the deed to her from Baker, hence that there was a deficiency in quantity in the lands so surveyed and defined as compared with acreage so contracted to be sold, and said Houstoun refused to execute said contract of sale and that said original contract of sale was abandoned; that subsequently negotiations were resumed and for the same consideration agreed on in the first contract for a conveyance of the lands embraced in said survey made by said Houstoun and the lands known as the "school house lot," which lot was more valuable, acre for acre, than the Baker lands contiguous thereto; that the school house lot was made to supply, according to the last contract, the deficiency in the acreage of the original contract; that upon the payment of the purchase money by Houstoun defendant, and her husband delivered to said Houstoun a deed; that said deed was prepared by said Houstoun to be executed by said defendant and her husband as a conveyance of the lands so defined by said survey and said school house lot, and no other lands or interest in lands; that she does not know whether the formalities required by law as to the execution and acknowledgement of the deed

were complied with or not; that she cannot now recall any fact or circumstance in connection with its execution and acknowledgement. A map is appended to the answer showing what part of the Baker lands were not included in said survey and not intended to be sold.

Wm. H. Christy, in his answer, denies that the deed from Houstoun to the Burches contained the true description sold to Houstoun by himself and wife, and alleges another survey with different metes and bounds, in which survey he was the chain bearer. Does not remember whether said deed from himself and wife to Houstoun was signed, sealed or delivered by him or his wife, or whether it was in the presence of two witnesses, who, as such, subscribed their names thereto, or whether it was or not acknowledged by him and his wife; that notwithstanding it was his intention that said deed should be duly executed and acknowledged, he has reason to disbelieve and so denies that all the essential formalities prescribed were duly observed by him and his wife in its execution and acknowledgement; that no improvements have been erected on the portion of the tract which respondent claims were not included in the deed to Houstoun.

The defendants have not produced any evidence to sustain their answer as to new matters set up therein or to matters that are responsive to the bill. In considering the answer as evidence we are restricted to the statements therein that are responsive to the complainants' allegations. The answer of both defendants deny that the deed which they admit that they made to Houstoun was of the lands as described in the bill. Is there sufficient evidence in the record to overturn their answers? We think there is. The evidence of Burch is that when he bargained for the land from Houstoun the defendants had not made a deed to him; that he saw a deed from Christy and wife to Houstoun which was shown to him by J. M. Daniel, this deed he says did not in-

clude all the lands that he had bargained for from Houstoun; that there were two pieces or parcels left out; that he refused to accept that portion of the land and that Judge Daniel went to Christy and wife about it; they refused to put in the deed both of the pieces which were left out but included the school house lot; that he carefully compared the descriptions of the property in the deed thus made with the deed which Houstoun was to execute to himself and brother; that they were both lying on the table before him; that Judge Daniel told him that he had forwarded the deed to Tallahassee, soon afterwards he received a deed from Houstoun and wife properly acknowledged. It was not the same deed that Judge Daniel had forwarded to Tallahassee but the description of the property was the same; that he was particular to look at it because it was not the same deed, afterwards learned that the deed was changed because Houstoun wished to change the form of warranty. The only difference in the deed prepared by Judge Daniel and the one executed by Houstoun was in the form of the warranty clause. The deed from Christy and wife to Houstoun acknowledged before John S. Swaim, who was a Justice of the Peace in Duval county. Swaim is now dead. Witness is certain that there were two witnesses to the deed and believes that one of them was J. M. Daniel; that he had frequently received notes from Mrs. Christy and had seen her sign her name; had seen Christy write his name very often. The deed had all the appearance of a regularly executed deed. Patrick Houstoun, a son of Edward Houstoun, testified that he wrote the deed from his father to the Burch Brothers and was one of the witnesses to it. The description of the land therein was copied from a deed from the Christys to Edward Houstoun; that Edward Houstoun died in 1875, does not remember whether the Christy-Houstoun deed was witnessed or not, nor whether it was ackowledged before a ju-

dicial officer or not; is unacquainted with the Christys; have never seen either Christy or his wife write; cannot say their signatures were genuine. It appears that a deed drawn by Judge Daniel for execution by Houstoun to the Burches was submitted to the first witness, Burch, who carefully compared the description of the land therein with the description of the land in the deed from the Christys to Houstoun; he knew their signatures; this deed thus identified as a genuine deed of the Christys, together with the copy prepared by Daniel, was sent to Houstoun at Tallahassee. Houstoun objecting to the form of the warranty of the deed, his son prepares another, with a deed purporting to be from the Christys before him. We must conclude that this was the deed testified to by Burch. The deed written by Patrick Houstoun was duly executed and sent to the Burches. Burch swears that seeing that it was not the same deed that was sent by Daniel for execution by Houstoun, looked at it particularly, and that there was no change in the description of the land. In addition to this testimony, it would seem improbable that the Christys would have acquiesced so long in the occupation of the land by Burch without making an effort to recover the same, if his occupation was wrongful, and equally improbable that Houstoun in selling land, which at the time of the sale he had not received a deed for from his vendors, should, after obtaining a deed from them, execute a deed to his vendors *with a warranty of title* of more land than his deed from them showed he owned; the evidence shows that he was a man of large estate, and it it is difficult to believe that he would have involved himself in such a manner. Another question arises: Was the deed from the Christys to Houstoun executed in accordance with the requirement of law? This deed having been lost, secondary evidence as to its contents is admissible. In case of a lost or destroyed writing, the law

is liberal in allowing presumption as to its regularity. In the case of Hart vs. Hart, 1 Hare Eng. Chan. Rep., p. 1, the Vice Chancellor said: "It is manifest that the greatest injustice might ensue, if in the case of a lost instrument the presumption of regularity upon a merely collateral point were not used in favor of the parties claiming under it."

In Rex vs. Long Buckley, 7 East, 45, it was held that an instrument which required a stamp, its loss being proven, would be presumed to have been properly stamped, although there was evidence of a negative character to rebut the presumption. So also it has been held that the subscribing witnesses may be dispensed with when the deed is lost and the witnesses are unknown. Felton and Pittman, 14 Geo., 530 ; Phillips on Evidence, vol 2, p. 557. The deed in question having been shown to be lost, and its contents having been established, we are bound to presume that it was executed in conformity with all the requirements of the law.

Counsel for appellants insist that inasmuch as the deed was lost without having been recorded, that under Sec. 6, p. 755, McC's Dig., it is invalid. This section is as follows: "The husband and wife shall join in all sales, transfers and conveyances of the property of the wife, and the real estate of the wife shall only be conveyed by a joint deed of the husband and wife, duly attested, authenticated and admitted to record, according to the laws of Florida regulating conveyances of real property."

The language of the statute as to recording the deed would almost seem to be imperative, yet it is impossible to conclude that the Legislature whose only object was the protection of the wife should make the title to her vendor dependent upon his acts or omissions after she had made to him a deed to the property and which acts or omissions could not in any possible way effect her interest. If she had sold the property and received the purchase money for it

she was protected as far as there was any need of protection, and it was a matter of indifference to her interest what the purchaser did with his deed.

We think that the only reasonable construction of the act is that the portion of it alluding to the recording of the deed from a married woman is not intended to affect the validity of the deed as between the married woman and her husband, the grantors and their vendee, but can allude only to subsequent purchasers. We feel clear that this is the proper construction of the act. To hold otherwise would be to say that a purchaser from a married woman held his title upon a condition which was not mentioned in the deed and the happening or non-happening of which was a matter of the utmost immateriality to her interest.

A deed must be in existence and in the hands of the recording officer before it can be recorded. No time is fixed by the law within which it must be recorded. The vendee may delay its record to suit his convenience. If it should be duly executed by a married woman and is lost, this loss alone, if the position of appellant's counsel is true, would operate as a reversion of the property to the grantor. It could not be recorded because it was lost and it could not be re-established because it had not been recorded. The Kentucky case of Scarbrough vs. Watkins, 9 B. Monroe, 540, and reported in American Decisions, vol. 50, p. 529, is materially different from this. The Kentucky statute required the deed of a married woman to be recorded within eight months, and if not so recorded it was not obligatory on her or her heirs. Another statute made all deeds duly proven or acknowledged but not lodged for record in the proper office in the time prescribed by law, if subsequently recorded as effectual for all purposes from the time of recording as if recorded within the time prescribed by law. The decision of the court turned upon the point that the latter stat-

ute was not intended by the Legislature to effect laws governing the recording of a deed from a married woman The Kentucky Court would not have refused relief where the deed was lost before the expiration of the eight months, upon are fusal of the grantor to execute another deed within that time and an application to re-establish it, nor can we, our statute fixing no time for its record, refuse relief when it has been lost without recordation and the time for recording it has not expired.

Decree affirmed.